IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 12, 2012

**WILLIAM J. FERRIS, SR. v. STATE OF TENNESSEE**

**Appeal from the Shelby County Criminal Court**
**No. 97-08277      Paula Skahan, Judge**

**No. W2011-00746-CCA-R3-PC  - Filed November 7, 2012**

William J. Ferris, Sr. ("the Petitioner") filed for post-conviction relief from his jury convictions of especially aggravated kidnapping, aggravated robbery, and aggravated burglary, alleging ineffective assistance of counsel at trial and on direct appeal.  After a hearing, the post-conviction court denied relief.  After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

David Christensen, Brentwood, Tennessee, for the appellant, William J. Ferris, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Doug Carriker, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Background Facts and Procedure**

In May 2002, a Shelby County jury convicted the Petitioner of two counts of especially aggravated kidnapping, one count of aggravated robbery, and two counts of aggravated burglary.  The trial court merged the two kidnapping offenses and the two burglary offenses and sentenced the Petitioner to an effective sentence of fifty-five years.  This Court affirmed the convictions and sentence on direct appeal.  See State v. William

Ferris, No. W2003-01317-CCA-R3-CD, 2005 WL 1291261, at *1 (Tenn. Crim. App. May 31, 2005).

The Petitioner filed for post-conviction relief in November 2006 and an evidentiary hearing was held in September 2010. The post-conviction court denied relief by written order entered February 28, 2011, and the Petitioner filed a timely notice of appeal. Before addressing the Petitioner's contentions, we review our summary of the proof adduced at the Petitioner's trial, as set forth in our prior opinion on direct appeal:

> The victim in this case, Melissa Bly-Ferris, was the defendant's estranged wife. According to the State's proof at trial, on February 10, 1997, the defendant, accompanied by two codefendants, Rickie Hopkins and Christopher Willis, forced his way into the victim's apartment, handcuffed her, took her jewelry and $113 in cash, and then transported her to Willis' home where she was confined for two days. On the third day, the defendant took the victim for a ride in his vehicle and she managed to escape. The defendant was subsequently charged in three separate indictments with two counts of especially aggravated kidnapping, two counts of aggravated burglary, and one count of aggravated robbery.

> The State's first witness at the defendant's May 20-24, 2002, trial was Geoffrey D. Greene, who testified that, in February 1997, he and the victim were engaged to be married and had been living together in a Memphis apartment for approximately four months. On Monday, February 10, 1997, he departed for work at about 7:40 a.m., leaving the victim alone in the apartment. Noticing en route that the air in one of his vehicle's tires was low, he pulled into a service station and discovered that the tire had been slashed. As he was putting on the spare tire, a young man he later learned was Rickie Hopkins approached and repeatedly asked him for a ride, making him uncomfortable by his persistence. He, therefore, kept a cautious eye on Hopkins as he completed changing the tire.

> After continuing to his workplace, Greene telephoned the victim at about 9:30 a.m. but failed to reach her. When he arrived home at lunchtime, he discovered the apartment door unlocked, the telephone off the hook, the victim's jewelry box missing, and the victim gone. After the police officer who responded to his call for assistance had taken his report and left, Greene drove to the defendant's home on Jessamine Cove but found no one at home. He then contacted the victim's family and friends and posted flyers with the victim's photograph in the neighborhoods around the victim's apartment and the defendant's home. On the third day of the victim's disappearance, acting

in response to a tip generated by one of the flyers, he returned to the defendant's home in time to see the defendant departing in a jeep with the victim as his passenger. After some maneuvering, he managed to block the jeep with his vehicle and stop the defendant. At that point, the victim jumped from the jeep and ran over to his vehicle. She got inside and he immediately drove them to the police department. Greene acknowledged he never contacted the defendant to inform him the victim was missing. He said, however, that the victim had previously warned him to suspect the defendant if anything should ever happen to her.

After waiving his Fifth Amendment rights, twenty-six-year-old Rickie Hopkins, who was indicted with the defendant on the same charges, testified he had been incarcerated since May 1997, first in the Mississippi Department of Corrections on burglary and false pretenses convictions, and since January 2000 at the Shelby County Jail. In December 1996 he was living in the defendant's Memphis home with the defendant, with whom he had enjoyed a long-term friendship, and "Little John," the young son of the defendant and the victim. Hopkins testified he was hiding out from the police, having violated his Mississippi probation on his burglary and false pretenses convictions. He said the victim, who was also his friend, was not living with the defendant at the time and that the defendant was actively searching for her. The defendant took Hopkins to area strip clubs with instructions to look for the victim and, without alerting her, report back to him if he should spot her working inside. Hopkins said he complied but never saw the victim at any of the clubs he checked.

Hopkins testified the victim had left the defendant on several previous occasions only to have the defendant force her to return to him. As an example, Hopkins related a 1994 incident in which the defendant instructed him to invite the victim to a party at his apartment. Hopkins testified that when the victim arrived with a boyfriend named Gary, the defendant and one of the defendant's sons, who were waiting in the darkened kitchen with shotguns, forced Gary on the floor at gunpoint, bound his arms with a coat hanger, and carried him outside to his vehicle. He said he and the defendant's son then drove Gary to his home while the defendant, the victim, and another woman followed in a separate car. Afterwards, the defendant and the two women, whom Hopkins described as "hysterical," "just left."

Hopkins testified that on February 9, 1997, the defendant and Christopher Willis left the defendant's house together at about 10:00 p.m. while he stayed behind to babysit Little John. When the men returned at 2:00

or 3:00 the next morning, Willis had a brown paper bag containing two pistols: a black, semi-automatic that looked like a 9 millimeter, which he gave to the defendant, and a chrome 357, which he put in his own pocket. The defendant instructed Hopkins to pack some clothing for Little John and told him that they were going to take the baby to a friend's before "going to go get [the victim]." According to Hopkins, the defendant had located the victim at least a week before and had learned the vehicle Greene was driving and Greene's work schedule.

Hopkins testified they arrived at the victim's apartment complex at about 5:00 a.m. after dropping Little John off with the defendant's friend. He said they waited in the defendant's parked jeep while the defendant formulated a plan for gaining entry into the apartment, discussing with Willis how they would slash Greene's tire, hide beside the building, and follow Greene back into the apartment after he discovered the flat. In accordance with that plan, Willis slashed the tire and Willis and the defendant took positions beside the building, leaving Hopkins in the vehicle with the engine running. However, when Greene came out, he drove off without seeing the flat. Therefore, the defendant and Willis returned to the jeep and the defendant began trailing Greene down the street. Soon, Greene pulled into a service station and the defendant stopped at a nearby shopping center. There, he handed Hopkins his pistol with instructions to pull it on Greene after obtaining a ride from him in his vehicle.

Failing in his attempts to get Greene to give him a ride, Hopkins returned to the jeep, where he, Willis, and the defendant watched as Greene changed his flat tire. They then followed Greene to his workplace before returning to the victim's apartment, where Hopkins gave the pistol back to the defendant, who slid it under his seat. The defendant and Willis then discussed having Willis force his way into the victim's apartment by posing as a process server, with the defendant and Hopkins to follow within a few minutes of his entry to the apartment. Accordingly, Willis left the jeep, and Hopkins and the defendant waited about four minutes before going to the apartment, where they found the door unlocked and Willis sitting inside beside the victim on a couch.

Hopkins testified that he did not see Willis' gun at that time and did not know if the defendant brought his pistol to the apartment. Nonetheless, he was positive that the victim, who was crying and obviously distraught, had not invited Willis into the apartment and did not want any of them to be there. He said the defendant ordered the victim to go into the bedroom with him, and he overheard her yelling to the defendant that he was not "worth shit" and she did

-4-

not want to go with him. When the defendant called, Hopkins and Willis also went to the bedroom, where the victim was packing clothes in a suitcase. She finished packing and the defendant picked up her purse, told Willis to get her suitcase, and ordered Hopkins to get her jewelry box.

Hopkins testified that Willis, additionally, took some cash that was lying on a stereo in the apartment. He said the defendant stopped to handcuff the victim's wrists at the front door before throwing a coat over her arms and escorting her out to the jeep, where he made her lie down in the backseat and had Hopkins, who got in the back with her, cover her with a blanket. The defendant then drove around for about forty-five minutes before pulling into the garage at Willis' house and taking the victim out of the jeep and into a bedroom of the home where she remained for the next two days. During that time, the victim emerged from the bedroom only twice, each time accompanied by the defendant.

Hopkins was positive that the victim did not willingly accompany the defendant into the house and was not free to leave once inside. He said each of the home's three doors had a double deadbolt lock that could be opened from the inside only with a key. He claimed he did not have access to a key and was therefore himself unable to leave the house during the time the victim was kept hostage. He stated that the defendant also remained in the house during that time but that Willis went out each day to work as a taxi-cab driver. On the second day, Willis returned with one of the flyers with the victim's photograph, which he showed to the defendant. The defendant reacted by calling the flyer a joke and saying that Greene was wasting his time trying to find the victim. The next day, however, the defendant asked Hopkins where he wanted to be dropped off, telling him that he was going to take the victim to a cabin in Hardy, Arkansas, where Greene would not find her. Hopkins testified that the defendant and the victim took him to the Southland Mall between noon and 1:00 p.m. that day, and he did not see them again.

Hopkins denied he had been promised anything in exchange for his testimony but acknowledged he anticipated being allowed to plead guilty to the charges with his sentencing to be determined at a later time. He further acknowledged that the defendant never discussed robbing the victim and that Willis took the cash from the apartment on his own. He said that, to his knowledge, Willis did not share any of the cash with the defendant. He conceded he never saw the defendant holding a weapon on the victim.

-5-

On redirect examination, Hopkins agreed that the prosecutor had told him he would be tried separately and would be allowed to plead guilty only if the victim consented. He explained that his primary motivation for testifying was his desire to accept responsibility for his actions and to put the matter behind him. In support of that claim, he identified a 2001 letter he had written to the prosecutor in which he had offered to plead guilty and had stated that he wanted no part in causing any further harm to the victim. In the letter, Hopkins reported having learned that the defendant had threatened that his brother and friends were going to prevent the victim from testifying at trial.

The twenty-four-year-old victim began her testimony by describing her relationship with the forty-eight-year-old defendant. She said she married the defendant when she was fifteen years old and pregnant with his child. The marriage was partly one of convenience, allowing her to become legally emancipated so that she could work as a stripper while still a minor. The defendant initially treated her well but after the birth of their child grew increasingly controlling, dictating her clothing, makeup, and actions, and accompanying her to her workplace and forcing her to give him the money she earned from dancing. Although she left him several times, he always eventually located her and forced her at gunpoint to return to him. She said the defendant also constantly threatened to kill her and was once arrested for choking her, but the charges were later dropped. She testified she had filed two divorce petitions against him: one soon after she turned eighteen, which was dismissed when she inadvertently missed a court date; and a second one that was still pending. The victim expressed her belief that the defendant had no intention of letting her go and said that he had engaged in a number of delaying tactics to prevent the divorce from being finalized.

The victim testified that at the time of the kidnapping she had filed for divorce and was fighting the defendant for custody of their son, who was at the time still living with the defendant. On February 10, 1997, she awoke to the sound of a knock at the door of the apartment she shared with Greene, followed by a man's voice stating that he was a process server for Melissa Ferris. Expecting it to be someone serving papers in connection with her pending divorce, she opened the door to find Willis, a taxi-cab driver she and the defendant knew from the club where she worked, standing at her door with a silver revolver in his hand. Although she screamed and attempted to shut the door, he forced his way inside and pushed her onto the couch, where he placed his knees on her stomach as he attempted to handcuff her. She told him she was pregnant, struggled, and slid to the floor. At about the time he managed

to get the handcuffs on her, Hopkins walked in, followed a few minutes later by the defendant.

The victim testified that she did not see Hopkins with a gun. The defendant, however, opened up his trench coat to show her a black pistol he had in the side of his pants and told her he would shoot her if she continued to scream, tried to run, or caused any other problems. He then picked her up from where she was sitting handcuffed on the floor and took her to the bedroom, telling her that he wanted to make it appear as if she had left Greene. The victim said that the men ultimately removed some of her clothing, her backpack, her jewelry and jewelry box, and $113 in cash from the apartment. She remembered that the defendant picked up a bag of her clothing but could not remember who took her jewelry box from the apartment. She said she believed it was Hopkins who took the cash. At a later point in her testimony, however, she stated that the defendant appeared to be the one in charge and that he gave the other men orders throughout the entire episode.

The victim testified the defendant held his gun in her back as he walked her from the apartment to his jeep, threatening to shoot if she "act[ed] stupid." She described the blanket that covered her during the thirty-minute-to-an-hour drive from her apartment to Willis' home and the bedroom in which the defendant placed her upon their arrival. She said there were no lights in the bedroom and the windows were covered in aluminum foil, but the first time the defendant left her alone she scratched a small hole in the foil. Through that small hole, she gained enough of a view of the street to allow her to later identify the location to the police.

The victim provided further descriptions of the conditions under which she was kept in the house, testifying that the defendant left the handcuffs on her wrists for the entire first day but on the second day placed them on her ankles instead. She said that for most of the time the defendant stayed in the bedroom with her, placing his gun on the dresser and alternating between threatening to kill her and talking about the wonderful things they were going to do together in the future. During that time, her son, who was brought to the house sometime after her arrival, was in and out of the bedroom. She ate nothing during her period of captivity because she refused the spaghetti the men offered her the first night and they never again offered her any food. She said the defendant reacted with anger when Willis showed him the missing flyer with her picture, screaming that it would now be a long time before they would be able to leave the house.

The victim testified she had no opportunity to escape because there were bars on the bedroom windows and one of the men was always in the living room. She therefore tried to convince the defendant that she still loved him and was willing to abort her baby for him, and she believed she was finally successful in that attempt after she had been held captive for about two days.[1] At that point, he placed the handcuffs back on her wrists, wrapped her in a blanket, and took her back through the house to the garage where he once again placed her in the backseat of the jeep with Hopkins while he got in the front seat with their son. Both he and Hopkins had a gun at the time but she did not see Willis. After driving for a while, the defendant pulled over and removed her blanket and handcuffs. She then got in the front seat with the defendant and their son got in the backseat with Hopkins.

The victim then said that after dropping Hopkins off at the Southland Mall, the defendant drove her and Little John to Mason, Tennessee, to look at a house with a basement, telling her that he needed a place to put her if she "misbehaved." He then took them to his home in Memphis where they gathered her bags, placed them in the jeep, and prepared to depart. Greene arrived as they were leaving and engaged the defendant in a type of "car tag" as he attempted to stop the jeep and the defendant attempted to get away. During this time, the defendant warned her not to get out of the jeep and threatened to kill her if she did so. However, when Greene finally succeeded in stopping the jeep, she took a chance and jumped from the jeep, leaving her son behind as she ran to Greene's vehicle and got inside. Before she could shut the car door, Greene sped away and drove immediately to the police department where she reported the kidnapping.

The victim stated that she was scared of the defendant during the kidnapping and remained extremely fearful of him at the time of trial. She explained that since her ordeal she had received a number of strange telephone calls and thought she had seen the defendant and others following her. She said she had been placed in a witness protection program and moved numerous times, but the defendant had been "spotted in quite a few places around where [she was] staying, quite a few times." The victim was adamant that she did not accompany the defendant anywhere of her own free will and had not consented to the removal of any of her property from her apartment.

---

[1] The victim testified she was unsure of the exact length of time she was held in the bedroom.

On cross-examination, the victim testified that, since the kidnapping, the defendant had shot her roommate in the throat and consequently had a charge of attempted second degree murder pending against him. She acknowledged she told the police in her original statement that the defendant had carried, rather than walked, her from her apartment. However, she explained that and other inconsistencies between her statement and her trial testimony by the fact that the statement had been given immediately upon the conclusion of her ordeal, during which she had been locked in a bedroom for three days and two nights.

Force Roberts testified he was a former lieutenant of the Shelby County Sheriff's Department and had been assigned to search the defendant's jeep following the kidnapping. He said he found a woman's leather coat and a blanket matching the victim's descriptions inside the vehicle, but he had no way of determining how long the items had been there.

Eddie Scallions testified he was a detective with the Shelby County Sheriff's Department in 1997 and that he executed a search warrant on Willis' house in connection with his investigation of the kidnapping. Scallions identified photographs of a number of objects he found inside the residence, including a police scanner; a partial box of Winchester .38 caliber ammunition; a .357 Smith and Wesson revolver along with six live rounds of .38 caliber ammunition, which he said were capable of being fired from the gun; a Peerless handcuff box; an instruction manual for the handcuffs; and a handcuff key. In addition, he testified that the windows on the east side of the house, which faced the street, were covered with tin-foil and that one of the windows had a small tear in the foil.

Dr. Gerald Stipanuk, the medical director of the Shelby County Jail, testified that the defendant, who was in a wheelchair in the courtroom, suffered from arthritis in his right hip and had received a hip replacement on April 24, 2001. He said the defendant was capable of walking; the wheelchair had not been prescribed and the defendant's treatment plan called for him to exercise as much as possible. He stated that the defendant had frequently sought medical treatment during his incarceration. During the course of his treatment, the defendant had told Dr. Stipanuk that he had recently won a million-dollar lawsuit against the Shelby County Jail and that he was being represented by a team of four attorneys.

Attorney Michael Gatlin testified he represented the bonding company that had made a $50,000 bond on the defendant, which the defendant had

forfeited on June 28, 1999, by his failure to appear at his original trial date. He said the company had hired several bounty hunters, including one who reported that he had located the defendant at a paramilitary encampment in Arkansas but was unwilling to retrieve him from that location. Gatlin testified he eventually filed a lawsuit against the defendant's sister, who had guaranteed the bond with a lien on her home and business, and she arranged for the defendant to be returned to custody in exchange for the dismissal of the suit against her. According to Gatlin's records, the defendant was returned to custody "[o]n or about" February 22, 2000.

Against the advice of his counsel, the defendant testified in his own defense, explaining that he was a "pimp" and met the victim when, as a runaway, she "fell in with a couple of girls" who were "working" for him and began "hanging out" at his house. Asserting that he had never pretended to be "a good guy," he acknowledged he began a sexual relationship with the victim when he was in his late thirties and she was only fifteen. He insisted, however, that he was not guilty of any of the offenses for which he was on trial. Specifically, he denied that he ever kidnapped the victim, broke into her apartment, robbed her, or held her anywhere against her will.

The defendant testified he married the victim to enable her to become legally emancipated so that she could work as a topless dancer. He said the victim worked for him for about four years until she turned eighteen, at which time he terminated the relationship. He stated the victim left several times over the course of their relationship, including once when she abandoned their child alone in a house when the child was only six months old and sick with a fever. The defendant maintained that the victim was always free to come and go as she wished and that he never threatened or forced her to return to him. He denied he contested the divorce but said he had filed for an extension of time to respond to the second petition because of the number of false allegations contained in it, including the victim's claim that he had paid his friends to kidnap her and that he had shot her friend in the neck while attempting to kill her. The defendant also denied that he had ever belonged to a white supremacist paramilitary group and said that, to his knowledge, he had not been indicted on one count of murder in the second degree, as alleged in the petition.

The defendant testified that on February 10, 1997, Hopkins, who worked for him, was at the Memphis Inn with some of the "girls," while he was at home with Little John, several other "girls" and a few men. He said that at about 8:30 or 9:00 a.m., Willis, who also worked for him, came in, gave

him about $3000 he had collected from some of the women who had worked the previous night, and informed him that the victim was at his house and wanted to see him. The defendant testified that Willis' house was a "flop house" and was used as a base from which the cabdrivers in his employ transported the women to area hotel rooms for their work.[2]

The defendant testified that when he and his son arrived at Willis' house, they found the victim sitting inside with several other women. After they had talked for a while, the victim voluntarily accompanied him and Little John first to the grocery store, where she remained in the jeep with the engine running while he and Little John shopped, and then back to the flop house where they spent the night. When asked if the victim was free to leave, the defendant replied:

> If she wanted to, she could have. She could have called anybody. [Willis] was in and out of the house. There were two or three cars there at the house. She could have went with anybody. She could have gotten in the cab with [Willis] when he was going – If she wanted to go out and turn a trick while he was there, she could have took off. If she wanted to go to the store, she could have jumped in the car and took off.

He said that the next day he, the victim, and their son dropped Hopkins off at the Southland Mall before driving to a house the victim wanted him to see, which was located in either Mason or LaGrange. He testified that they stopped to eat at a restaurant on their return trip and that he left the victim alone while he took their son to the restroom. According to the defendant, there were several other patrons inside the restaurant and a highway patrol vehicle was parked outside when they arrived. The victim, however, made no attempt to inform anyone that she was being held against her will. He said they returned to Memphis after their meal, stopping at several different houses and area hotels for him to collect money from his women before going back to Willis' house. Later, he took the victim to a strip club, returned home with his son, packed a few things, picked up some of his women, and then drove to Baltimore, where he remained for approximately two weeks.[3]

---

[2] The defendant later explained that the aluminum foil covering the house's windows was used to block the sunlight so that the women, who worked at night, would be able to sleep during the daytime.

[3] The defendant claimed to run a broad-ranging prostitution business that serviced several other cities
(continued...)

The defendant testified he never encountered Greene at his house while the victim was with him in his jeep and said that if he had, he would have "crushed his car up like a little tin can." He said that Greene, Hopkins, and the victim were lying and Dr. Stipanuk had him confused with someone else. He denied he was "hunting" for the victim on June 21, 1999, or that he shot anyone while in the process. He explained his failure to appear in court for his original June 28, 1999, trial date as the result of the victim's having convinced "three or four individuals . . . that it would be in their best interest" to hold him "for ransom and to extort some pictures." He said he was held in captivity for eight months, that he escaped only the day before he was returned to custody, and that he did not report the kidnapping to the police because his attorney advised him to say nothing about it until after the conclusion of his trial. Finally, he acknowledged he had been convicted of kidnapping in 1985.

William Ferris, 2005 WL 1291261, at *1-8. As to sentencing, this Court recited on direct appeal that the trial court sentenced the Petitioner as a violent offender to twenty-five years for each of the especially aggravated kidnapping convictions; as a Range II, multiple offender to twenty years for the aggravated robbery conviction; and as a Range II, multiple offender to ten years for each of the aggravated burglary convictions. Id. at *1. After merging the two kidnapping convictions and the two burglary convictions, the trial court ordered that the kidnapping, burglary, and robbery sentences be served consecutively to each other for an effective sentence of fifty-five years. Id.[4]

*Evidence at Post-Conviction Hearing*

At the post-conviction hearing, the Petitioner testified that he was incarcerated prior to trial. He stated that he needed additional time in the jail's law library and that his trial lawyer ("Trial Counsel") performed deficiently in failing to obtain the additional time. He also complained that, whenever he tried to discuss his case with Trial Counsel, Trial Counsel "was always in a rush." According to the Petitioner, they "never talked about [his] case at all." Moreover, Trial Counsel was suspended from the practice of law for a period of forty-five days during the course of the representation. The Petitioner was not aware of this at the time, and he had no contact with Trial Counsel during the suspension period.

---

[3](...continued)
besides Memphis, including Baltimore and St. Louis.

[4] The opinion on direct appeal mistakenly refers to the Petitioner's total effective sentence as twenty-five years instead of fifty-five years. See William Ferris, 2005 WL 1291261, at *1.

The Petitioner stated that he was in a wheelchair during the trial because the guards would not allow him to use his walker. The trial judge did not allow him to sit at counsel table. Accordingly, he was unable to communicate with Trial Counsel during his trial. This arrangement compromised Trial Counsel's performance with witnesses.

Referring to the transcript of the trial, the Petitioner recalled that Trial Counsel had asked a State witness a question which elicited the information that, prior to trial, the Petitioner had been at a "paramilitary encampment." Trial Counsel also had remarked during opening statement that the trial might include "references to paramilitarism and white supremacy." Trial Counsel had not filed a pre-trial motion to exclude such references. Also admitted at trial was the victim's divorce petition filed against the Petitioner which included an averment that the Petitioner had been a member or participant in a white supremacy or paramilitary group. According to the Petitioner, Trial Counsel read this averment out loud during his direct examination of the Petitioner at trial.

The Petitioner testified that the trial court sequestered the jury at the State's request. The Petitioner stated that the sequestration harmed his case because "it imputed to the jury that there was something going on that they didn't know about or wouldn't – they were being kept in the blind about something." He complained about the sequestration to Trial Counsel, and Trial Counsel responded that there was "nothing [they] can do about it." The issue was not raised on appeal.

The Petitioner also stated that one of the jurors was married to a nurse who worked in the jail for Dr. Stipanuk, who testified against the Petitioner at trial. The Petitioner claimed to have been prejudiced by this juror and that he had told Trial Counsel to object to the juror's being on the jury. The Petitioner also stated that the jurors, although sequestered, were allowed to go home at night after having been placed on the jury.

The Petitioner testified that Trial Counsel failed to request a hearing on a motion to exclude references to the Petitioner's prior convictions. Accordingly, after the Petitioner took the stand, the prosecutor asked him about his prior kidnapping and robbery convictions.[5]

The Petitioner testified that Trial Counsel "never showed any interest in [his] case." Trial Counsel failed to get him a list of the State's witnesses. Trial Counsel failed to interview the State's witnesses. Trial Counsel failed to obtain the services of an investigator. He provided Trial Counsel with a list of defense witnesses, but Trial Counsel did not contact

_____

[5] The prosecutor asked the Petitioner during cross-examination about his prior kidnapping conviction after a bench conference, and the trial court instructed the jury that it could consider the prior conviction only for impeachment purposes. Trial Counsel objected to the admission of this proof.

-13-

them. Trial Counsel, however, did subpoena four of them. Nevertheless, Trial Counsel did not call these witnesses to testify. The Petitioner stated that his witnesses would have provided testimony relevant to "impeachment and collateral type issues." The Petitioner also testified that Trial Counsel failed to provide him with "discovery materials"; failed to file a motion to exclude the victim's divorce complaint; failed to request the trial court to charge the lesser-included offense of theft on the robbery charge; performed deficiently in his cross-examination of the victim; and failed to file a timely notice of appeal. He did not provide the Petitioner with a copy of his presentence report. At the sentencing hearing, Trial Counsel did not object to one of the Petitioner's prior convictions, which the Petitioner described as an "uncounseled guilty plea," and did not inform the Petitioner of his right to address the court. Trial Counsel put on no proof of mitigation, and the trial court sentenced the Petitioner to the maximum sentence available on each of his convictions.

The Petitioner also complained about his appellate lawyer ("Appellate Counsel"), stating that Appellate Counsel failed to communicate with him, failed to file an adequate brief, and failed to include the transcript of the sentencing hearing in the appellate record. Appellate Counsel also failed to raise issues on appeal, including the sequestered jury, the admission of the Petitioner's prior convictions, the admission of a police scanner, the admission of Dr. Stipanuk's and Mr. Gatlin's testimony, the exclusion of the Petitioner's brother from the courtroom, the trial court's failure to charge the lesser-included offense of theft, and the length of his sentences.

On cross-examination, the Petitioner stated that, during his meetings with Trial Counsel immediately before trial, Trial Counsel suggested that the Petitioner take a plea-bargain that included a sentence of over one hundred years. They did not talk about trial strategy or a defense theory. They did not discuss his right to testify or whether he should testify. He stated that he had intended to testify the entire time, but Trial Counsel never discussed it with him. Trial Counsel's direct examination of him was ineffective, he thought, because "he didn't create a situation that presented [his] case to the jury or [his] position." On the other hand, the prosecutor's cross-examination of him was "very damaging." The Petitioner complained that he "had no idea what was coming down the pike" with cross-examination.

Patricia Ferris May, the Petitioner's sister, testified that she called Trial Counsel several times at the Petitioner's behest. On these occasions, she "usually had to talk to" Trial Counsel's secretary. Trial Counsel "wouldn't relay back and forth to [her] what was going on."

The State called Trial Counsel, who testified that, as of September 2010, he had been practicing law about twenty-three years. He was appointed to represent the Petitioner and described their relationship as "tumultuous." The prosecutor gave him "open file" discovery,

and he read through the "large" amount. He met with the Petitioner "quite a few times." Their defense theory was that the victim was an "estranged wife" and "a vindictive woman that was just trying to get him back for some things."

Trial Counsel recalled bringing up the Petitioner's alleged association with a paramilitary or supremacy group during voir dire. He explained that he was concerned that the prosecution was going to bring it up during trial, and he "didn't want the State to . . . catch [them] blindsided." He wanted to be able to challenge any jurors that found the Petitioner's alleged association "very, very, objectionable."

Trial Counsel testified that, while he was questioning the Petitioner during direct examination at trial, the Petitioner "would just start talking and just go on and on and on." Trial Counsel explained, "it was like he was on an ego trip in answering the questions, and going along with what basically the State had said." Trial Counsel eventually resorted to leading questions during his direct examination of the Petitioner. According to Trial Counsel, the Petitioner's testimony on direct examination was harmful to his case. Trial Counsel added,

> one of the big problems I had in the trial, I was trying to stay away from, was the difference in ages [between the Petitioner and the victim].
>
> And one of the things, and I noticed that when this question was asked, no not asked but answered, I looked at the jury and the question the State asked was, you stole this woman – you kidnapped and stole this woman's money.
>
> And the answer to that was, I didn't steal anything from her except maybe her youth. And I just looked at the jury and just kind of dropped my head.
>
> But that was the kind of stuff that kept coming out. And based on his body language and his actions during the trial, quite frankly, even if the evidence had not been as strong as it was, the jury's opinion of him would have caused [them] to vote against him.

Trial Counsel stated that, "all during the trial [the Petitioner] had been telling [him] how to run the trial." The Petitioner requested that he ask questions that Trial Counsel thought were "inappropriate." Moreover, Trial Counsel "knew where he was going. [He] had a goal and objective in mind, and [he] tried to ask questions that would [keep] him on that road to getting to [his] goal."

Trial Counsel stated that he did not object to the prosecution's request that the jury be sequestered, in part because he was concerned about publicity. He tried to talk to the victim but was unsuccessful. He was also unable to talk to the Petitioner's co-defendant. Trial Counsel acknowledged that he had been suspended from the practice of law for a brief time during the pendency of the Petitioner's case. He did not visit the Petitioner during his suspension.

On cross-examination, Trial Counsel explained that, as he was reading through the discovery provided by the State, he saw references to the Petitioner having lived in Arkansas with a paramilitary group. He acknowledged having brought up the term "white supremacy" during voir dire. He reiterated that he wanted to "root out" potential jurors who were biased against such persons. He admitted that he did not investigate the Petitioner's alleged association with this group, other than to inquire of the Petitioner about it. The Petitioner told him that "it wasn't true." Trial Counsel also admitted that he did not file a motion in limine on the issue. Trial Counsel also did not file a motion to exclude references to the Petitioner's prior convictions and admitted that it would have been a "good idea." He could not recall why he did not have an investigator appointed.

Trial Counsel stated that he advised the Petitioner about what questions the prosecutor might ask him during cross-examination and advised the Petitioner to keep his answers succinct. He denied having received the written witness list from the Petitioner that had earlier been admitted as an exhibit to the Petitioner's testimony. He stated, however, that the Petitioner may have given him a list of names. He did not contact witnesses whom he determined had nothing relevant to say about the crimes at issue. Trial Counsel stated that he consulted with the Petitioner on the motion for new trial.

When asked why he did not object to the victim's testimony that the Petitioner had previously forced her to return to him, Trial Counsel replied that he "might have been arguing with [the Petitioner] and missed it." Trial Counsel explained that, during the trial, the Petitioner "was constantly trying to tell [him] what to do and what not to do, so [he] spent a lot of time talking to him as opposed to listening to the testimony." He recalled the victim's complaint for divorce against the Petitioner being admitted into evidence at trial. He did not recall that it contained references to "white supremacy" and "paramilitary groups." He acknowledged that those references would be a "problem" and "highly prejudicial." He did not recall whether he objected to the admission of the complaint. He stated that "today," he would object, but that "[b]ack then," he did not know if he "was that familiar with the law or whatever, procedurally, to do that."

-16-

The State next called Lee Coffee, who testified that he was the assistant district attorney general who prosecuted the Petitioner's case.[6] He provided open-file discovery to the Petitioner's lawyer. He never made a plea-bargain offer of one hundred and forty-four years.

Coffee explained that the Petitioner had forfeited his bond by failing to appear on a trial date. A bond hearing was later held because the Petitioner was trying to reinstate his bond. At the hearing, the State called Michael Gatlin, who represented the bonding company, to testify about the bonding company's problems with getting the Petitioner back to Memphis. The State was attempting to establish that the Petitioner was a danger to the community and a flight risk. Part of the testimony at the bond hearing alleged that the Petitioner was a white supremacist and a member of a paramilitary group. At trial, the State also was trying to establish by this proof that the victim legitimately was terrified of the Petitioner and that she was not, as the Petitioner contended, a vindictive ex-wife. At trial, Coffee decided to add Dr. Stipanuk and Gatlin as witnesses in response to the defense theory that the victim was framing the Petitioner.

Coffee explained that he asked the judge not to dismiss the original indictment until after trial because the jail had been releasing detainees in error upon such dismissals, in spite of other pending indictments.[7]

On cross-examination, Coffee reiterated that the victim's petition for divorce from the Petitioner was offered as "contextual background information as to why [she] was afraid of" the Petitioner and to rebut the defense theory that "this was a loving marriage." He explained that he had wanted to demonstrate that the victim was afraid that the Petitioner "had the ability to have other people carry out his deeds for him" and that, "if he were, indeed, a member of some kind of a group that had the ability to bring terror to [the victim], it went to show her statement [sic] of mind as to why she was, in fact, afraid." As to why he proffered this proof during his case-in-chief, as opposed to in rebuttal, Coffee stated that he was responding to the defense's voir dire and opening statement.[8]

---

[6] Lee Coffee is now the judge of Division VII Criminal Court in Shelby County, Tennessee.

[7] Although the indictments are not in the record before us, there was apparently a superceding indictment.

[8] During opening statement, included as an exhibit to the post-conviction hearing, Trial Counsel told the jury that the Petitioner

will tell you what we have here is a scorned lover. They were not divorced. They were still married. She was working at a topless club, just as we talked about yesterday [during voir

(continued...)

-17-

The State also called Appellate Counsel, who testified that he met with the Petitioner about the appeal. He acknowledged that, although he raised the Petitioner's sentence as an issue, he failed to include the transcript of the sentencing hearing in the appellate record. He did not recall the Petitioner asking him to appeal the admission of the police scanner, the sequestration of the jury, or the exclusion of his brother from the trial. He determined that the admissibility of Gatlin's testimony lacked merit as an appellate issue. He acknowledged that he did not challenge the trial court's application of enhancement factors with respect to the Petitioner's individual sentences.

In addition to this testimony, transcripts of the proof at trial, the motion for new trial hearing, and the sentencing hearing were admitted as exhibits.

The post-conviction court denied relief by written order filed February 28, 2011. The court found that the Petitioner had "failed to prove his allegations of fact by clear and convincing evidence." The court also determined that Trial Counsel's decision not to hire an investigator was a strategic decision; that Trial Counsel spent an adequate time meeting with the Petitioner for trial preparation; that Trial Counsel did not perform deficiently in failing to interview the State's witnesses because they refused to speak with him; that Trial Counsel determined that the Petitioner's witnesses's proposed testimony would not be beneficial; that Trial Counsel was not deficient in failing to obtain pre-trial transcripts; that Trial Counsel was not deficient in not objecting to a sequestered jury; that Trial Counsel was not deficient in failing to object to the presence of the victim's boyfriend in the courtroom during trial; and that Trial Counsel generally was not deficient in his cross-examination of the victim. With respect to the admission of the victim's complaint for divorce against the Petitioner, the post-conviction court determined that,

---

[8](...continued)

dire]. That's why I asked you about this. [The Petitioner] married her. She worked there. While working there, she decided that she was going to run off with somebody else . . . . Ran off with him, got pregnant, then wanted to come back. [The Petitioner] says no, I'm having none of it. I was treating you as a queen. I kept you. I took care of you . . . . You chose to run off with somebody else. You chose to get pregnant by somebody else while we are still married and now you want to come back. No, I'm having none of it.

. . . .

And what we have is a scorned lover. She could not go back to him. He said I am not accepting you back. She says well, I will ruin you. I will see to it that you are ruined. I will see to it that you go to jail. If I can't have you, then nobody will because I'll see to it that you're in jail for the rest of your life.

[w]hile the failure to object to admissibility of the pending divorce Petition may amount to an unprofessional error on the part of Trial Counsel, it is not shown that but-for this isolated error, the result of Petitioner's trial would have been different. Therefore, this claim as grounds for post-conviction relief must fail.

As to references at trial to the Petitioner's association with a white supremacist or paramilitary group, the post-conviction court acknowledged that such proof "could very seriously inflame a jury" and "result[] in a considerably prejudiced outcome." Nevertheless, the court concluded as follows:

> The Petitioner has failed to establish, by a reasonable probability, that the failure of [the] trial judge . . . to exclude the testimony of Mr. Gatlin and Trial Counsel's statements on voir dire regarding white supremacy or paramilitary groups resulted in the requisite prejudice to the outcome of his case. The Petitioner's claim for post-conviction relief based upon this ground fails because the law requires a petitioner to establish more than simply that the errors had some "conceivable effect" on the outcome of their case, but that there is a reasonable probability that there would have been doubt as to guilt without the errors.

(Footnote omitted).

The post-conviction court also concluded that the Petitioner had not established that Appellate Counsel provided ineffective assistance of counsel because he failed to demonstrate either that Appellate Counsel had performed deficiently or that he suffered prejudice as the result of any alleged deficiency.

In this appeal, the Petitioner contends first that the post-conviction court's order is inadequate because it "failed to address numerous issues asserted in the petition for post-conviction relief and at the evidentiary hearings," referring to Tennessee Code Annotated section 40-30-111(b) (2006). He also contends that the post-conviction court erred in concluding that he did not receive ineffective assistance of counsel at trial and on appeal.

**Standard of Review**

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by

"clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

**Analysis**

*Adequacy of Post-Conviction Court's Order Denying Relief*

The Petitioner contends in his brief that the post-conviction court should be reversed because it did not

> specifically state findings in the order regarding the following allegations of constitutional error: [1] the State superseded the original indictment and both indictments remained pending when [the Petitioner] went to trial; [2] that [T]rial [C]ounsel continued to represent [the Petitioner] despite having a suspended law license; [3] trial court's refusal to permit [the Petitioner] to sit next to his counsel a[t] trial; [4] Dr. Stipan[u]k's testimony regarding [the Petitioner's] credibility prior to [the Petitioner's] testimony; [5] the lack of a public trial; [6] the exclusion of [the Petitioner's] brother from the trial; [7] the failure of trial counsel to conduct a Morgan hearing regarding the admissibility of [the Petitioner's] prior convictions; [8] [T]rial [C]ounsel's failure to object to or file a motion to suppress any mention of a police scanner in the prosecution's case-in-chief; [9] the use of a non-counseled felony conviction to enhance [the Petitioner's] sentence; and [10] the denial of the opportunity to allocution at sentencing; amongst other things.

We hold that the Petitioner is not entitled to a remand for further findings on any of these issues.

First, as this Court previously has recognized, when we are

> provided with the trial transcript, which contains the factual basis for the Petitioner's claims, as well as the post-conviction court's conclusion that the Petitioner failed to show deficient performance and prejudice to his

-20-

case[,] . . . the record is sufficient for appellate review and . . . it [is] unnecessary to reverse the post-conviction court in order for that court to make findings of fact and conclusions of law.

Claude F. Garrett v. State, No. M2011-00333-CCA-R3-PC, 2012 WL 3834898, at *24 (Tenn. Crim. App. Sept. 5, 2012).

Second, to the extent that any proof was offered at the post-conviction hearing as to issues [2], [7], [8], [9] and [10], these issues were couched in terms of ineffective assistance of counsel. The trial court's order is sufficient as to these issues. Moreover, the Petitioner has failed to support any of these alleged ineffective assistance of counsel issues with legal argument or citations to the record indicating that, even if the post-conviction court had made additional findings in his favor, he, therefore, would be entitled to post-conviction relief. Accordingly, these issues are waived. See Tenn. R. App. P. 27(a); Tenn. Ct. Crim. App. R. 10(b).

As to the other specific constitutional issues that he claims the post-conviction court failed to address, we note that the Petitioner did not provide copies of his alleged multiple indictments to the post-conviction court, nor are they included in the record on appeal. Therefore, this issue also has been waived. See Tenn. R. App. P. 13(c) & 36(a); see also State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993) ("Absent the necessary relevant material in the record an appellate court cannot consider the merits of an issue.") (citing Tenn. R. App. P. 24(b)). As to issue [3], Trial Counsel testified that the Petitioner spoke with him during the trial. The post-conviction court's order denying relief implicitly accredited Trial Counsel's credibility over that of the Petitioner. Thus, this issue is without merit. As to issue [4], the Petitioner fails to explain how the order of proof constituted a constitutional violation. Therefore, this issue has been waived. See Tenn. R. App. P. 27(a); Tenn. Ct. Crim. App. R. 10(b). The Petitioner's contention in issue [5] that he was denied a public trial stems from his assertion that the courthouse doors were locked during his trial. Coffee denied this during the post-conviction hearing. The post-conviction court's order implicitly accredits Coffee's testimony on this point. This issue is without merit. As to issue [6], the transcript of the trial establishes that the trial court ordered the Petitioner's brother from the courtroom after hearing testimony of threats and after establishing that the Petitioner's brother was not there at Trial Counsel's request as the brother claimed. This issue could have been raised on direct appeal. Consequently, it is waived for purposes of this proceeding. See Tenn. Code Ann. § 40-30-106(g) (2006). We decline to speculate about the issues to which the Petitioner refers in his catch-all phrase, "amongst other things."

For the foregoing reasons, this matter need not be remanded to the post-conviction court for further findings.[9]

*Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[10] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). Our Supreme Court has explained that:

_____

[9] If a post-conviction petitioner determines that the post-conviction court's order lacks required findings of fact and conclusions of law, it would seem appropriate for the petitioner first to file a motion for an amended order, setting forth the issues and supporting proof upon which he or she is requesting further findings and conclusions. See Tenn. R. Civ. P. 52.02. However, although post-conviction proceedings have been recognized as having attributes of a civil proceeding, see, e.g., Watkins v. State, 903 S.W.2d 302, 305 (Tenn. 1995), our supreme court has declared that Tennessee Rule of Civil Procedure 52 does not apply to post-conviction proceedings. See Tenn. Sup. Ct. R. 28, § (3)(B). Thus, a post-conviction petitioner is not required to file such a motion.

[10] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

-22-

[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant, 263 S.W.3d at 869 (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

## Trial Counsel

In his brief to this Court, the Petitioner contends that Trial Counsel was ineffective in failing "to properly investigate the case." This allegation focuses on Trial Counsel's failure to find and call defense witnesses to support the Petitioner's defense theory at trial. The Petitioner concludes his argument on this issue by contending that "[t]here is a reasonable probability that had trial counsel contacted these witnesses, the outcome of the case would have been different." However, the Petitioner called none of these alleged

defense witnesses at the post-conviction hearing. This Court has made clear that a claim of ineffective assistance of counsel arising from the failure to call a witness must be supported by testimony from the witness at the post-conviction hearing. See, e.g., Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996); Wade v. State, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995); Black v. State, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990); see also Pylant, 263 S.W.2d at 869. Without the alleged witnesses' testimony, there is no way for the post-conviction court (or this Court) to evaluate whether the absence of the testimony from trial had a prejudicial effect on the outcome. Accordingly, the Petitioner is entitled to no relief on this issue.

The Petitioner also contends that the post-conviction court erred in concluding that Trial Counsel was not ineffective with regard to the references at trial to the Petitioner's association with a white supremacist or paramilitary group. These references arose during several points of the Petitioner's trial. During voir dire, Trial Counsel stated the following:

> [W]e've heard oftentimes about, shall we say, paramilitary groups. We've all heard about them, haven't we? And these are groups that are supposed to have certain feelings about the race of an individual and how they would judge that person. Does anybody have any real strong feelings about that? The reason I'm asking – I mean, it's nothing wrong with it. If you do, just fess up because we want to know. And not only us, but [the prosecutor] wants to know, also. If, you know, you're going to hear some talk about that and would that rub you the wrong way? And it's important. I don't particularly care about them either, but I have a job to do. And my job is to represent him to the best of my ability. So whatever I'm thinking about these paramilitary groups or these white supremacy and all of that stuff, I've got to put aside and I'm asking you if you can do that. If you can't, just let me know.

Trial Counsel testified at the post-conviction hearing that he was satisfied with the responses he received on this issue from the jurors who sat on the Petitioner's case.

In addition to these references during voir dire, the victim's complaint for divorce, admitted during her testimony, contained an allegation asserting that the Petitioner "is also a member of, or at least an active participant in, a white supremacist paramilitary group." Also, Michael Gatlin, an attorney who represented the bonding company that posted bail for the Petitioner on the underlying charges, testified at the Petitioner's trial that the Petitioner had failed to appear at a court appearance and therefore had forfeited his bail. Because the bail was large in amount, the bonding company contacted a "bounty hunting company." The Petitioner was tracked to a location in Arkansas. Gatlin testified that the local sheriffs were "unwilling to go get him" because he "was at some para-military camp." Trial Counsel objected on the basis that this information was irrelevant, but the trial court overruled the

objection on the basis that it was relevant to prove the Petitioner's flight. Gatlin testified that the Petitioner eventually returned to the jurisdiction, and Gatlin did not know where he had actually been in the meantime. On cross-examination, Gatlin admitted that he did not know if the Petitioner had actually been with a paramilitary group.

In response to this proof, the Petitioner testified at trial that the allegations in the victim's complaint for divorce were untrue. He testified that he had never been a member of a paramilitary group and did not know anyone who was. He also denied ever having been a member of a white supremacy group or participating in any of such a group's activities. The Petitioner denied during his testimony at trial that he had "run off to Arkansas with this group." He claimed, rather, that he had been "held captive" and physically prevented from appearing in court on his court date. On cross-examination at trial, the Petitioner claimed that he had been held for eight months.

We agree with the post-conviction court that Trial Counsel's performance in this regard was deficient. However, our review of the record of the trial convinces us that these references did not render the jury's verdict unreliable. A trial lawyer's performance during voir dire, of course, may result in a finding that the lawyer was ineffective. To support such a conclusion, however, a petitioner for post-conviction relief must establish that his or her lawyer's deficient performance during voir dire resulted in a biased juror being seated on his or her jury. See Smith v. State, 357 S.W.3d 322, 348 (Tenn. 2011) (citing Dellinger v. State, No. E2005-01485-CCA-R3-PD, 2007 WL 2428049, at *30 (Tenn. Crim. App. Aug. 28, 2007), aff'd 279 S.W.3d 282 (Tenn. 2009)); William Glenn Rogers v. State, No. M2010-01987-CCA-R3-PC, 2012 WL 3776675, at *37 (Tenn. Crim. App. Aug. 30, 2012). The Petitioner adduced no such proof at his post-conviction hearing.

As to the other references, we note that the State's proof in this case consisted primarily of the victim's testimony and that of one of the Petitioner's co-defendants. The Petitioner also testified, clearly to his detriment. The jury had more than enough proof before it upon which to convict the Petitioner as charged. The testimonial references to the Petitioner's alleged association with white supremacists and/or a paramilitary group were few, brief, and denied by the Petitioner.

In sum, the proof of the Petitioner's involvement in a paramilitary or white supremacist group was limited and contested. In light of the remaining proof in the record, we hold that the Petitioner has failed to demonstrate that he was prejudiced by Trial Counsel's failure to exclude this testimony. Therefore, the Petitioner is entitled to no relief on this issue.

<u>Appellate Counsel</u>

Next, the Petitioner contends that Appellate Counsel was ineffective by failing to include the transcript of the sentencing hearing in the record on direct appeal. We note that Appellate Counsel challenged the trial court's imposition of consecutive sentences in the direct appeal. In spite of the deficient record, this Court determined that the record was sufficient to allow review on the merits of this issue and affirmed the trial court's decision. <u>William Ferris</u>, 2005 WL 1291261, at *12-13. Accordingly, Appellate Counsel's failure to include the transcript did not adversely affect appellate review of the issue raised. This issue is without merit.

The Petitioner also contends that Appellate Counsel was ineffective in failing to raise the following issues on direct appeal:

> trial counsel's failure to have a pretrial hearing regarding the admissibility of [the Petitioner's] prior conviction for kidnapping and robbery; the sequestration of the jury; the exclusion of [the Petitioner's] brother from the courtroom; the admissibility of testimony regarding a police scanner; the admissibility of Dr. Stipan[u]k's testimony; the admissibility of Mike Gatlin's testimony; lack of access to the law library in the Shelby County Jail; failure to charge theft as a lesser included offense of robbery; and that the sentence was excessive and erroneous.

We agree with the post-conviction court that the Petitioner is not entitled to relief on the basis of ineffective assistance of appellate counsel regarding these issues.

As in claims of ineffective assistance of trial counsel, a petitioner claiming ineffective assistance of appellate counsel must prove both that appellate counsel's performance was deficient and that the deficiency prejudiced the defense. <u>See</u> <u>Carpenter v. State</u>, 126 S.W.3d 879, 886 (Tenn. 2004). The failure to raise issues on direct appeal is not, in and of itself, deficient performance. <u>See</u> <u>id.</u> at 887 ("Appellate counsel are not constitutionally required to raise every conceivable issue on appeal."). Rather, "[t]he determination of which issues to raise on appeal is generally within appellate counsel's sound discretion." <u>Id.</u>

When the claim of ineffective assistance of appellate counsel rests on the failure to raise issues, the claim will fail if the omitted issues lack merit or are weak. <u>See</u> <u>id.</u> at 887-88. And, when the omitted issue would result in, at most, a determination of harmless error, the omission caused no prejudice. <u>See</u> <u>Robert M. Linder v. State</u>, No. E2008-00693-CCA-R3-PC, 2010 WL 3210399, at *13 (Tenn. Crim. App. Aug. 13, 2010), <u>perm. app. denied</u> (Tenn. Oct. 12, 2010) (on claim of ineffective assistance of appellate counsel, holding that, because

the omitted issue was harmless error, the petitioner "cannot establish prejudice"). Accordingly, the omission of such issues also entitles a post-conviction petitioner to no relief.

With respect to the omitted issues identified by the Petitioner in his brief, we note first that Trial Counsel did object to the prosecution's use of the Petitioner's prior kidnapping conviction[11] for impeachment purposes, albeit during trial rather than prior to trial. Even if the trial court erred in admitting this proof, however, the error was harmless, at most. The sequestration of a jury is left to the trial court's sound discretion, see Tenn. Code Ann. § 40-18-116 (Supp. 2002), and the Petitioner has failed to demonstrate that the trial court abused its discretion in ordering sequestration in his case. Similarly, the exclusion of particular persons from a courtroom is left to the trial court's sound discretion, see, e.g., Taylor v. State, 808 So.2d 1148, 1200 (Ala. Crim. App. 2000), and the Petitioner has failed to demonstrate that the trial court abused its discretion in this regard. As to the admissibility of testimony regarding a police scanner and the admissibility of Dr. Stipanuk's and Gatlin's testimony, our review of the trial record convinces us that any error in the admission of this proof was harmless, at most. The Petitioner's alleged lack of access to the law library in the Shelby County Jail was not an issue cognizable on direct appeal. As to the trial court's alleged failure to charge theft as a lesser-included offense, we note that, in the hearing on the Petitioner's motion for new trial, the trial court stated specifically that it charged theft as a lesser-included offense.[12] Accordingly, the Petitioner has failed to demonstrate that Appellate Counsel was ineffective in failing to raise any of these issues on direct appeal.

As to the Petitioner's sentence, we have noted previously that Appellate Counsel challenged the trial court's imposition of consecutive sentences, and this Court affirmed the trial court's ruling on the merits. See William Ferris, 2005 WL 1291261, at *13. However, Appellate Counsel did not challenge the length of the Petitioner's individual sentences on the basis that the trial court erred in its application of enhancement factors so as to maximize the Petitioner's sentence on each of his offenses.

The record before us contains the transcript of the Petitioner's sentencing hearing and reflects that the trial court applied numerous enhancement factors to the Petitioner's sentences, including the factor for the Petitioner's "previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." Tenn.

---

[11] Contrary to the Petitioner's allegation, the prosecutor did not impeach him with a prior robbery conviction.

[12] The record before us does not include the jury instructions delivered at the Petitioner's trial.

Code Ann. § 40-35-114(1) (1997).[13]  At the time the Petitioner was sentenced in 2002, our Sentencing Act established a presumptive sentence which the trial court could increase upon the application of statutory enhancement factors.  See generally State v. Gomez, 239 S.W.3d 733, 739-40 (Tenn. 2007).  Following the United States Supreme Court's decisions in Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny, our supreme court determined that, "to the extent the [Sentencing] Act permitted enhancement based on judicially determined facts other than the fact of a prior conviction, it violated the Sixth Amendment." Gomez, 239 S.W.3d at 740.  However, Gomez was not decided until years after the Petitioner's sentencing hearing.  During the period of time between the Apprendi decision and Gomez, the issue of whether a trial court could enhance a defendant's sentence on the basis of "judicially determined facts" was "still winding its way through both the state and federal court systems and was very much alive."  Robert M. Linder, 2010 WL 3210399, at *13 n.7.

Nevertheless, even if Appellate Counsel should have preserved the issue, we hold that the Petitioner would not have prevailed in his quest for a lesser sentence even if, on direct appeal, this Court had found error in the trial court's application of several enhancement factors. We conclude that the trial court's imposition of the maximum sentences for each offense was appropriate solely on the basis of the Petitioner's "previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range."  Tenn. Code Ann. § 40-35-114(1).  Although the presentence report is not in the

---

[13] The trial court also applied the following enhancement factors:

(2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

(5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;

(8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;

(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;

(10) The defendant had no hesitation about committing a crime when the risk to human life was high; [and]

(16) The crime was committed under circumstances under which the potential for bodily injury to a victim was great[.]

Tenn. Code Ann. § 40-35-114(2), (5), (8), (9), (10) & (16).

record before us,[14] the Petitioner testified at his trial that he began having sex with the victim when she was fifteen years old and he was in his thirties, conduct that constitutes the felony of statutory rape. See Tenn. Code Ann. § 39-13-506(a), (d) (1991).[15] He also testified that he ran a wide-spread prostitution ring. Promoting prostitution is also a felony. See Tenn. Code Ann. §§ 39-13-512(4), 39-13-515 (1991, 1997). Thus, the Petitioner admitted at trial to engaging in significant criminal behavior prior to the offenses for which he was being tried. Application of the enhancement factor for previous criminal behavior does not require that the defendant actually was convicted of the offenses when the defendant admitted to having engaged in the illegal conduct. See, e.g., State v. Moss, 13 S.W.3d 374, 388-89 (Tenn. Crim. App. 1999). No Sixth Amendment violation occurs when a defendant's sentence is enhanced on the basis of factors to which he or she admitted. See Blakely v. Washington, 542 U.S. 296, 303 (2004); State v. Watkins, 362 S.W.3d 530, 559 n.49 (Tenn. 2012); State v. Calvin Jerome Oliver, No. M2008-01824-CCA-R3-CD, 2010 WL 681377, at *8 (Tenn. Crim. App. Feb. 26, 2010). This Court has affirmed maximum sentences on the basis of prior criminal activity alone. See, e.g., State v. Carl Junior Fritts, No. E2007-02183-CCA-R3-CD, 2008 WL 4560223, at *4 (Tenn. Crim. App. Oct. 9, 2008); State v. Ronald B. Finch, No. M2002-01050-CCA-R3-CD, 2003 WL 21997743, at *4 (Tenn. Crim. App. Aug. 22, 2003); see also State v. Carl G. Boone, No. M2009-00188-CCA-R3-CD, 2010 WL 432411, at *5 (Tenn. Crim. App. Dec. 8, 2009). Accordingly, the Petitioner was not prejudiced by Appellate Counsel's failure to raise this issue.

In sum, the Petitioner has failed to demonstrate that he is entitled to post-conviction relief on the basis of ineffective assistance of Appellate Counsel.

## Conclusion

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE

---

[14] We note that, when a petitioner fails to submit a complete record on appeal, the State may seek to supplement the record. See Tenn. R. App. P. 24(a), (b).

[15] The victim's complaint for divorce, included in the record on appeal, indicates that the victim's birth date is June 9, 1977.